# WILLKIE FARR & GALLAGHER LLP

MICHAEL S. SCHACHTER
212 728 8102
mschachter@willkie.com

787 Seventh Avenue
New York, NY 10019-6099
Tel: 212 728 8000
Fax: 212 728 8111

March 28, 2017

**VIA ECF AND HAND DELIVERY**

Hon. Alison J. Nathan
United States District Judge
Thurgood Marshall United States Courthouse
40 Foley Square
New York, New York 10007

Re:   *United States v. Burrell, et al., S2 15 Cr. 95 (AJN) – Sentencing of Robert Haughton*

Dear Judge Nathan:

We represent Robert Haughton in the above-captioned matter. Robert is scheduled to be sentenced before Your Honor on April 4, 2017 at 2:00 p.m.

Robert Haughton is 21 years old and is the product of a fractured and unstable upbringing. Robert grew up without parental guidance or supervision, and without basic economic or social stability. With this as his foundation, he has spent much of his very brief adult life in prison. Although Robert has pled guilty to participating in a racketeering conspiracy centering around the activities of the BMB street gang from 2007 to 2016, he was, in fact, incarcerated for all but approximately 15 months from his 18th birthday in April of 2013 to being charged in this case. Robert's participation in the charged conspiracy was limited to selling crack cocaine at the corner of 224th Street and White Plains Road for approximately 10 months of that limited 15-month window.

Based on this conduct, on September 23, 2016, the Government entered into a plea agreement with Robert, (the "Plea Agreement") which stipulated, in their view, and in ours, that the Guidelines range applicable to Robert's conduct was 46 to 57 months of imprisonment. After execution of the Plea Agreement, Probation concluded that the Plea Agreement failed to hold Robert accountable for three Youthful Offender sentences, one entered on October 13, 2011, and the other two entered on April 3, 2014. Probation's analysis results in a substantially higher Guidelines range than the Government or Robert had anticipated: 77 to 96 months. None of these three sentences were listed on Robert's Criminal Repository, and as a result, they were not known to the Government or to us at the time the Plea Agreement was executed.

Robert faces this sentence because of the bad choices he has made, and there is no question that he must bear the consequences of his actions. However, we hope that the Court will examine Robert's

conduct through the prism of his life experience. Robert's story is not that of someone who was given every advantage and opportunity, provided with stable and positive role models, and yet *still* chose a life of crime when so many legitimate paths were placed before him. On the contrary, life gave Robert an upbringing characterized by the absence of parental support, beset by near-constant relocations, and lacking any semblance of social or economic stability. Robert states that "I truly want [Your Honor] to know that as a kid i been through somethings that I could not understand as a child. I still have times of not understanding it totally . . . " (Ex. E, Letter from Robert Haughton at 2.) This does not excuse Robert's significant misconduct. Robert knows this. He "acknowledge[s] the wrong and bad acts that [he has] done . . . to [his] family and community." (Ex. E, Letter from Robert Haughton at 2.) Many people certainly rise above such circumstances to lead law-abiding lives. However, we submit that the cards life dealt Robert are relevant to understanding his actions during his young life. We ask that this Court take those factors into consideration in sentencing him.

**Robert's Background**

By the age of 10, Robert had no parental figures in his life, as by that time both his mother and father had been deported to Jamaica. Prior to their being deported, Robert lived with his parents in Poughkeepsie and then in Mount Vernon, New York. Robert's father sold marijuana to provide for his family. However, when Robert's father was deported (Robert was about nine years old at the time), Robert's mother could no longer afford to remain in Mount Vernon, and moved Robert and his four siblings to a studio apartment at 229 Bronxwood Avenue in the Bronx.

At 229 Bronxwood, the family lived hand-to-mouth, with Robert's mother depending on the charity of her then-boyfriend, or on petty crime, to support the family. Robert and his siblings – both male and female – slept in the same bed. Their mother slept in a cot or on the floor. Eventually, Robert's mother was able to acquire public assistance, and the family moved to a marginally larger apartment on 229th Street and Laconia Avenue. Whatever stability this provided was soon dashed, however, when Robert's mother was deported to Jamaica, apparently for stabbing another individual during an altercation. (Presentence Investigation Report ("PSR") at ¶ 56.) Robert was about 10 years old. Robert describes the deportation of his mother as an "emotional tragedy." (Ex. E. Letter from Robert Haughton, at 1.)

At this point, Robert and his siblings went to live with their aunt, Kari Ann Blackwood, at her apartment at 214 Paulding Avenue in the Bronx. Robert and his siblings lived with Kari Ann until Robert was in about seventh grade. Robert and his four siblings, Kari Ann, and her own child all lived under the same roof. Here, at least, Robert's male and female siblings were afforded the modest luxury of not all having to share a room and a bed together. Still, with three boys crammed into a single bed, Robert oftentimes was forced to sleep on the floor. Robert describes the experience of living in the Bronx after his mother was deported with just one word: "horrible."

When Robert was approximately 14 years old, in yet another family disruption, he and his siblings were split up. Robert's younger siblings, Romario and Nia, were sent to Jamaica. One of Robert's older sisters, Shiquanna, went to live with another relative. Robert's other older sister, Crysan, went to live on her own in the Bronx. Robert stayed with Crysan very briefly before being sent up to Poughkeepsie to live with his grandfather. Robert's grandfather ran a small taxi company in

Poughkeepsie and might have provided Robert with some much needed parental guidance and stability. However, by this point, the years of familial dysfunction and relocation had begun to take their toll, and Robert was already becoming a disciplinary problem. In his own words, he had too much of the "Bronx mentality" in him. Ultimately, Robert's grandfather threw him out of the house. As a result, Robert moved back to the Bronx, once again deprived of the potential for a stable, positive home and family environment. Although Robert finished eighth grade in Poughkeepsie, as a result of his downward spiral into a life of petty crime and the consequences of that life, he never went back to school.

Returning to the Bronx, Robert moved in with his sister, Crysan, who was living with Kari Ann's friend, Marlene, and shortly afterwards moved back in with Kari Ann again. Robert's various siblings had returned to the Bronx by this point, and once again, the whole family – Crysan excluded – was crammed into Kari Ann's small apartment, along with Kari Ann and her now three children. Robert lived at Kari Ann's apartment until he was incarcerated in October of 2014. Robert has remained in prison from October 2014 through the present.

Robert's descent into a life of petty crime – through association with BMB or otherwise – has had obviously terrible consequences for him. In the absence of parental guidance or supervision, Robert "went to the older guys on the street to look for guidance." (Ex. E, Letter from Robert Haughton, at 1.) Clearly, these were not the positive and stable role models Robert so desperately needed. Between the deportation of his parents by the time he was 10, and the constant relocations – often to living circumstances that afforded little in the way of personal privacy or parental supervision – Robert was deprived of such simple and perhaps even overlooked comforts as having his own bed, or a safe and stable home environment to return to at the end of the day. Indeed, Robert has stated that he has lived better in prison – with the security of three meals a day, a roof over his head, and his own bed to sleep in – than he did growing up on the outside.

Robert's involvement with BMB was, at times, viewed by him as a means of providing both himself and his siblings with basic necessities and financial support. As he says in his letter to the Court, "[k]nowing that there wasnt [sic] much my aunt could do for me and my siblings I had to go out on the streets to find away [sic] to eat and to help my brothers and sisters." (Ex. E, Letter from Robert Haughton, at 1.) Indeed, the difficult circumstances of his upbringing and lack of parental support notwithstanding, Robert has always felt an obligation to support the other members of his family. Robert was often responsible for paying the phone bills of various members of his family, for buying clothing for his brothers and sisters, and, at times, for putting food on the table.

Robert's deeply troubled childhood and lack of parental support or supervision notwithstanding, he has maintained close relationships with his siblings, several of whom visit him regularly in prison. In fact, several members of Robert's family have submitted letters to the Court, which are attached as exhibits to this sentencing submission. The letters from Robert's family show a side of Robert that is not visible from his Criminal Repository or PSR. It is a side that it was perhaps *impossible* for Robert to show in the often violent and criminal social circles in which he moved. As his siblings make clear in their letters, although Robert's behavior is certainly not *excused* by his upbringing, it is perhaps *explained* by it somewhat. The letters from Robert's family paint a picture of Robert as a brother who

cares deeply for his siblings, who has tried to support and provide for them as best he could in the absence of parental supervision or guidance, and who is clearly loved by his siblings in turn.

What is clear from reading the letters from Robert's siblings is that the deportation of their parents was a profoundly traumatic and shattering experience for the entire family, and for Robert in particular, who, according to his sister Nia, had a "really tight bond" with his mother, (Ex. A, Letter from N. Haughton, at 1-2) and according to his brother Romario, was a bit of a "mama's boy . . . because our mom spoiled us." (Ex. B, Letter from Romario Haughton, at 1.) Indeed, Robert himself describes his mother as "my only learning foundation." (Ex. E, Letter from Robert Haughton, at 1.)

After their parents were deported, Robert and his siblings were basically left to fend for themselves. Although they were taken in by their aunt, Kari Ann Blackwood, Kari Ann made it clear she had little interest or ability to care for, raise, or supervise Robert and his siblings. Robert's sister, Crysan, paints a particularly bleak picture of this environment, writing, "[s]ince my mother got deported it's been really hard on us. All we had was her. Our family members abandoned us and I was left to provide for my siblings at the age of 17." (Ex. C, Letter from C. Garriques, at 1.) Robert's younger brother, Romario, writes that "[l]iving with our aunt was horrible. She hated us, we all knew it, she even showed it." (Ex. B, Letter from Romario Haughton, at 1.)

What is also clear, especially from Robert's younger siblings, Nia and Romario, is that in the absence of their parents, Robert tried as best he could to step up and help provide for his brothers and sisters. Nia writes that after their parents were deported, Robert "as the older brother went out of his way to be the man of the house." (Ex. A, Letter from N. Haughton, at 1.) Romario writes that Robert "[made] his own money to help the family out at a young age" and that Robert was a caretaker to his younger siblings, "always defending me when I got bullied." (Ex. B, Letter from Romario Haughton, at 1.) Robert's sister Shiquanna writes that Robert "is a great uncle" and "helps out a lot with the kids." (Ex. D, Letter from S. Haughton, at 1.) Robert's older sister, Crysan, tried to be something of a parental figure to Robert in the absence of their parents, but by her own admission, was no substitute for Robert's actual parents, writing that it was difficult to "provide [for] or discipline Robert" as she was "only a teenager [her]self." (Ex. C, Letter from C. Garriques, at 2.)

Robert's absence due to his frequent periods in prison has taken a toll on his family members. Crysan writes that she would often become depressed after their parents were deported, feeling that she wasn't doing a good job of providing for the family, but that "Robert never complain[ed] and whenever I got frustrated, depressed, or was ready to give up he comforted me that everything was going to be okay." (*Id.* at 1-2.) Robert's absence as a form of support for Crysan is sorely felt. In fact, Robert has spent so much of his youth incarcerated that his youngest sibling, Nia, feels at times as though she doesn't really know him, which "breaks [her] heart." (Ex. A, Letter from N. Haughton, at 1.) Perhaps the most profound reaction to Robert's incarceration and its effect on his family comes from Romario, who writes:

> [E]very time [Robert] went to jail I became depressed and lonely I didn't want my parents anymore I just wanted the bond me and my older brother had. I would cry all the time[] until I realized that it's Robert's fault he's in this perdicament [sic] but he was only a

> young boy with a huge heart trying to make his family good and back to how things were. . . . I can honestly say I truly miss my brother every single day. Not a day that goes by I don't think how me and my brother was so close[] more like the sun in the sky. We could never have that bond again.

(Ex. B, Letter from Romario Haughton, at 1.) Nia, Robert's youngest sibling, puts it more simply when she writes, "[i]t's really sad when you don't have a mother or father and spend your entire childhood in jail." (Ex. A, Letter from N. Haughton, at 1.)

Since being charged in this case, Robert has been in the process of trying to better himself. He is currently studying for his GED, and has expressed a sincere interest in turning the page when released, although he acknowledges that his record of felony convictions may make it difficult for him to find work. Crysan, with whom Robert speaks frequently, and who was often responsible for caring for Robert when he was much younger, writes that "[f]rom the conversations we have been having, I can tell that he's a changed youth. He speaks more positive [sic] and wants better for his future." (Ex. C, Letter from C. Garriques, at 2.)

**The Offense Conduct**

As noted above, Robert has entered a plea of guilty to a single count of conspiracy to violate the racketeering laws under 18 U.S.C. § 1962(d). The count to which Robert pled guilty relates to the activities of the BMB gang, which operated "principally in the vicinity of White Plains Road between 215th Street and 233rd Street in the Bronx, New York, including in an area on 224th Street described by members of the Enterprise as the 'Forts,' as well as in the vicinity of Boston Road and Eastchester Road in the Bronx, in an area described by members of the Enterprise as 'B-Road.'" (Superseding Indict. at ¶ 2.)

Count One of the Indictment describes BMB as "criminal organization whose members and associates engaged in, among other things, murder, attempted murder, robbery, attempted robbery, narcotics trafficking, bank fraud, and the passing of counterfeit currency." (*Id.* at ¶ 1.) Robert, however, is not mentioned in the Indictment in connection with any discussion of specific acts of violence committed by BMB, nor is he mentioned in either of the Government's Enterprise Letters, which lay out in great detail the criminal activities of various members of BMB in furtherance of the gang's illegal activities.

Although Count One of the Indictment describes BMB as operating from 2007 through 2016, (*id.* at ¶ 11) Robert's actual involvement with BMB was far more limited in scope and duration than a plain reading of the Indictment suggests. As an initial matter, Robert was only 12 years old in 2007 when the conspiracy described in the Indictment began, and he did not become actively involved in BMB until many years later. Additionally, Robert's run-ins with law enforcement during his adolescence, which resulted in several periods of imprisonment, prevented him from actually becoming extensively involved with BMB. Indeed, Robert was incarcerated for 21 of the approximately 36 months from his 18th birthday, on April 9, 2013, through his being charged in the Indictment on April 12, 2016.

While Robert did certainly participate in BMB's narcotics trafficking activity by selling crack cocaine at the "Forts" – a location controlled by BMB – the *maximum* amount of time he could realistically be said to have been an active member of the BMB conspiracy is approximately 15 months in total from his 18th

birthday through the present. And, in fact, Robert was only actually selling narcotics as part of the BMB conspiracy from approximately May through early September of 2013, and again from May through October of 2014 – a period of 10 months. Furthermore, Robert did not use armed force in furtherance of his activities selling narcotics in connection with BMB. As a result, Robert is not mentioned in Count Four of the Indictment, which charges use of a firearm in connection with the RICO and narcotics conspiracies charged in Counts One and Two, respectively.

**Robert's Sentence**

Pursuant to the Plea Agreement, Robert and the Government agreed that the applicable Guidelines offense level related to his offense is 21. Count One involves a racketeering conspiracy under 18 USC § 1962(d), the Guideline for a violation of which specifies a base offense level that is the greater of 19, or the offense level applicable to the underlying racketeering activity. (U.S.S.G. § 2E1.1.) In this case, the conspiracy, as applicable to Robert, was a conspiracy to distribute crack cocaine. The Government has agreed that Robert was responsible for selling between 28 and 112 grams of crack cocaine in connection with the BMB conspiracy, resulting in a base offense level of 24. Robert's base offense level has been reduced by two points for acceptance of responsibility, and by one additional point because his timely acceptance of responsibility and notification to the Government has assisted the Government in the investigation and prosecution of his own misconduct. This results in a total offense level of 21.

The Plea Agreement concluded that Robert has four criminal history points, which resulted in a criminal history category of III. Based upon Robert's total offense level and his criminal history category as set forth in the Plea Agreement, the Guidelines range applicable to Robert's sentencing – as agreed to by the Parties – is 46 to 57 months' imprisonment. As noted above, however, Probation disagreed with the analysis in the Plea Agreement, and concluded that this analysis had failed to take account of three Youthful Offender sentences, mentioned at paragraphs 37, 40, and 42 of the PSR. We would call to the Court's attention that at the time of the first sentence – imposed on October 31, 2011 – Robert was only 16 years old. Furthermore, the sentences of one year imprisonment referenced in paragraphs 40 and 42 of the PSR were imposed on the same day as the sentence in paragraph 39 of the PSR, and all three of those sentences were served concurrently. These caveats aside, Probation's analysis raises Robert's criminal history category from III to V, resulting in a substantially higher Guidelines range than either the Government or Robert had anticipated: 70 to 87 months, rather than 46 to 57 months.

*****

Robert knows he has made bad choices, and understands and accepts responsibility for the consequences of those choices. He is deeply sorry for his conduct and how that conduct has affected members of his family and his community. He accepts that the consequences of his actions are that he must face prison time. In his own words, "I now know that my actions were so improper. I know that I have affected so many people out there on the streets in my community Your Honor. I know that i have made many famlies [sic] cry from what I was distributing when I was out there . . . I acknowledge the wrong and bad acts that I have done not just to me but to my family and community[.]" (Ex. E, Letter from Robert Haughton, at 2.)

Robert is ready to turn over a new leaf when he is released, so that Your Honor "will never see [him] in front of your court room again and [his] family will never have to come to a jail or prison to see [him]," (Ex. E, Letter from Robert Haughton, at 2) and to that end, has been working hard to obtain a GED so that he will be able to find work once released and not relapse into the criminal conduct that resulted in him being before Your Honor in the first place. In light of the circumstances of Robert's upbringing and his relatively modest participation in the conspiracy alleged in Count One of the Indictment, as well as the fact that Robert's additional youthful offender convictions were not known either to us or to the Government at the time the Plea Agreement was negotiated and executed, we ask that the Court impose a sentence within the 46 to 57 month Guideline range stipulated to by the Parties in the Plea Agreement.

Respectfully submitted,

Michael S. Schachter

cc: Rachel Maimin, AUSA
    Micah Smith, AUSA